Filed 6/10/26  In re C.W. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re C.W., a Person Coming Under the Juvenile Court Law. | A175108 |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, | (Humboldt County Super. Ct. No. JV2300069) |
| Petitioner and Respondent, | |
| v. | |
| K.W., | |
| Objector and Appellant. | |

At the jurisdictional stage of this juvenile dependency case, the court found that both parents' actions had placed the then-four-year-old child at substantial risk of serious emotional harm under Welfare and Institutions Code section 300, subdivision (c).[1] K.W., the child's mother, now appeals from that jurisdictional finding.  Because we agree with mother that it is unsupported by substantial evidence, we reverse the jurisdictional order in part.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

# BACKGROUND

## A.

Mother and the child's father, who is not a party to this appeal, reside separately but share custody of the child. Mother and father's relationship has been contentious, and they have been engaged in litigation against one another in family court.

The two have been the subject of numerous previous referrals to the Child Welfare Services Division of the Humboldt County Department of Health and Human Services (Department), including one prior sustained dependency petition concerning the child, based on substance abuse by both parents, domestic violence by father, and inadequate supervision by mother. In the earlier dependency case, the child resided in foster care for approximately eight months before being returned to her parents' custody after the parents engaged in counseling, high conflict co-parenting classes, and other services, and they maintained their sobriety.

In early September 2024, mother contacted the Department and reported that the child had made several statements that she had been hurt or tickled when her father "poked her" or touched her in the vaginal area. In August, mother had noticed that the child's vaginal area was "bright red and sore." When mother commented, "Owiee!," the child stated: "It hurts cause Dada poke it. I tell him to stop and he won't stop and then he says he is sorry."

A couple days later, the child made a similar statement while her mother was taking off her pull-up diaper. According to mother, she then "asked her if it is when dada is changing her diaper and she said no. I told her she can tell him to stop and tell him not to touch her. [The child] then stated that he cannot stop and he says he is sorry."

A few days later, while mother was bringing the child to her father, the child said to him, "Don't touch my butt." Father responded, "only when I change your diaper," and the child said, "Nooooooo…"

The following day, while mother was taking off the child's pull-up diaper, the child "looked up at [mother] and wiggled her tongue back and forth in her mouth and stated, 'Dada do dat. It's funny and it tickles.'" When mother said, "What did Dada do?," the child "wiggled her tongue back and forth in her mouth, placed her cupped hands over her vagina and stated, 'It tickles, it's funny.'"

Several days later, the child commented during a diaper change that "It hurts cause Dada scratch it." When mother asked her what she meant, the child rubbed her finger nails up and down her inner thighs and said, "It hurts cause Dada scratch it cause he loves me so much." Mother asked if the child asked him to stop, and the child responded: "He can't stop, he won't stop, because he loves me so much." Although mother had not initially been concerned when the child first started making these statements, the most recent statements alarmed her.

After consulting with relatives and friends, including a licensed childcare provider, mother called a Department hotline and reported the child's statements. The Department advised her to bring the child to the hospital to be examined. The child received an external physical examination at the hospital, but mother declined a more intrusive examination. Although the doctor observed redness and irritation in the child's genital area, it did not appear abnormal.

The next day, social worker Mirian Alvarado and a colleague came to mother's home and attempted to interview the child, but the child was focused on playing and made no

3

disclosures to them.[2]  The Child Abuse Services Team (CAST) then interviewed the child in mid-September, at which point the child was "unable to focus" and made no disclosures.[3]  The Department closed its investigation, concluding that the allegations that father had sexually abused the child were unfounded.

In May 2025, mother again reported concerning statements made by the child involving father.  Mother was reading children's books about "body and touch" with the child and asking her about the names of her body parts.  Mother had purchased the books because members of the CAST had given her one book and advised her that "it's a good idea to teach a child the names of their body parts . . . so they know how to identify them."  While reading one of the books to the child, mother asked whether anyone had touched her private parts and the child said that her dad had.  According to mother, the child "took off her underwear and was rubbing her vagina and anal area . . . in a clearly abusive way."

Fearing that father had sexually abused the child, mother recorded audio of the ensuing conversation.  Mother asked the child "if it hurts when her dad touches her."  When the child did not respond, mother asked "if she can show me how [her dad] touches her."  The child then took off her underwear and "rubb[ed] her vagina with her fist vigorously."  The child moved her hand, "rubbing inside her butt crack and . . . stick[ing] a finger in her butt," and then explained that her dad "washes his

---

[2] Alvarado advised mother to apply for a restraining order against father, suggesting that if she did not do so, the child could be removed from her because it was "a safety issue."  Mother sought a protective order the following day, but her application was denied.

[3] Apart from the CAST interview, law enforcement did not interview the child in connection with the sexual abuse allegations against father.

hands after he touches her butt and vagina." Mother asked if father "asks her before if he can touch her or does he just do it and [the child] responded that he just does it." Mother "asked if he thinks she is sleeping when it is happ[en]ing and [the child] state[d] no." Mother then asked her to repeat what she just said without her pacifier in her mouth and the child then repeated the same motions and statements. The next day, mother reported the child's statements by calling the Department hotline. Mother also filed an application for a restraining order against father in family court.

A few days later, at the end of May, Alvarado made an unannounced visit to mother's home and attempted to interview the child. Alvarado "ask[ed] [the child] different questions about her home and . . . about different body parts, what her understanding of that was." The child wanted to play with her toys and "it was a little hard to engage her." During the interview, when Alvarado asked if she knew what hugs were, the child said no. Mother interrupted the interview "[b]ecause [she] knew [her] daughter was avoiding the questioning," and mother said, "Well, I give you hugs." At times, mother asked the child follow-up questions if she did not answer Alvarado's questions, became confused about her body parts, or did not recall something she had said earlier. Subsequently, after Alvarado went out to her car to call her supervisor, the child approached Alvarado's car with mother, wanting to speak with Alvarado. Alvarado asked her what she wanted to share, and the child told her that "Dad hit butt." Alvarado asked "what that looked like" and the child slapped her vagina.

The following month, another social worker, Shannan Crozier, called mother to make an appointment to bring the child into a Department office for another interview. During the interview, the child was not comfortable speaking with the social workers. Crozier attempted to engage the child, but she did not

5

respond to the questions and "just wanted to play games." The Department closed the investigation into the allegation of sexual abuse by father as unfounded.

**B.**

The Department initiated this dependency case based on a referral from the family court. (See § 329, subd. (a).) The Department did not detain the child. After receiving competing requests for restraining orders, the court had become concerned that the parents' actions had subjected the child to emotional abuse. As relevant here, based on mother's application for a restraining order, the court was concerned that the mother's questioning of the child about sexual abuse, asking the child to demonstrate such abuse, and recording the child could cause "potential emotional harm."

The Department's dependency petition alleged that the child "is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of" each parent. (§ 300, subd. (c).) With respect to mother, the petition alleged that the child "is at substantial risk of serious emotional harm as a result of the mother['s] . . . excessive efforts to prove allegations that the father . . . sexually abused the child. The mother has repeatedly asked the child to repeat statements, used leading questions, recorded her questioning the child, and has had the child demonstrate the sexual abuse by scratching/rubbing at her vaginal area. During an interview between the child and the social worker, when the child did not give the answer the mother expected, the mother moved to sit with the child and ask leading questions to coax the child. The child had a CAST interview in September of 2024 and has been interviewed by the Department and law enforcement multiple

6

times, and no disclosures were made. The mother continues to coax the child to try to get her to make a disclosure."

With respect to father, the petition alleged that the child was "at substantial risk of serious emotional harm as a result of the father, . . . excessively questioning the child about what occurs at the home of the mother . . . . The father's behaviors include repeatedly recording the mother's home, including the mother's interactions with the child, to gain information to support the alleged abuse and neglect he believes is occurring. The child has been interviewed by the Department and law enforcement multiple times as a result."

The petition also alleged that the child was at substantial risk of suffering serious physical harm or illness due to both parents' failure or inability to supervise or protect the child adequately. (§ 300, subd. (b)(1).)

At the detention hearing, the court found that services were available to prevent removal of the child from her parents and ordered that the parents be provided with alcohol and drug testing, substance abuse treatment, parenting education, and mental health services pending further proceedings.

At the October 2025 jurisdiction hearing, the court received testimony from social workers Alvarado and Crozier, both parents, and Nicola Wilson, who was the child's therapist until August 2025. Wilson, who had provided parent-child therapy to mother and the child for two years, testified that the child had not made any disclosures to her, but Wilson made a mandated report to the Department based on the statements reported by mother. During the time Wilson worked with them, mother did not seem intent on proving that the child was sexually abused, and she did not appear to be coaching the child in any way. Crozier testified that "in the beginning[,] [mother] didn't believe" that father could be sexually abusing the child, but that "with more and more coming out she was starting to believe it."

7

Similarly, mother explained that she did not "want to vilify the father and [she had] asked for advice." She "tried to do [her] best . . . to not . . . influence [the child] and to find out the truth."

In finding jurisdiction based on section 300, subdivision (c), the juvenile court stated, "I don't think [mother] was intentionally trying to get [the child] to say things. I don't think she was doing that with malice. But I have a lot of concerns when this child is four years old, has been in foster care eight months of her very young life. The parents are in constant battle with each other it seems. Both making accusations against the other without substantiation." The court noted that mother's belief that the child had been abused may have been influenced by Wilson, who apparently believed, based on the child's reported statements, that the child had been abused. The court expressed "fear that" Wilson's opinion had "impacted mom because then she has a therapist telling her this has happened to her child when she was not in a position to make those assessments. So I don't fault [mother] for that." The court found that, by a preponderance of the evidence, the petition's section 300, subdivision (c), allegations were true, but rejected the allegations under section 300, subdivision (b). The court continued the child in the parents' shared custody and set a disposition hearing.

At the disposition hearing in December 2025, the court adjudicated the child a dependent and placed her with her parents under a plan of family maintenance. Both parents argued that they had engaged in services and made progress, and that the case belonged in family court. Mother had completed a Triple P Parenting course, a pre-recorded 12-hour high conflict parenting course online, one out of six associated two-hour classes, and a psychological evaluation, and mother was willing to continue with services and therapy. The court acknowledged "the progress the parents have seemed to have made." However, the court found that to dismiss the case with a voluntary case

plan "would be premature." Because "[c]onflict between parents, high conflict . . . [is] toxic for children," the court expressed that "at the very least, six months of steady involvement and improvement . . . would need to be seen before we take it out of juvenile court and . . . return it to Family Law."

## DISCUSSION

### A.

Before addressing the merits of mother's challenge to the juvenile court's jurisdictional findings, we must consider whether our review is appropriate given that the juvenile court's order is independently supported by its findings against father, who has not appealed. In the circumstances here, we will exercise our discretion to review mother's appeal.

In dependency cases, the court exercises jurisdiction over the child, not the child's parent. (*In re D.P.* (2023) 14 Cal.5th 266, 283.) So long as jurisdiction is supported by one " 'unassailable jurisdictional finding,' " the validity of additional jurisdictional findings is " 'immaterial.' " (*Ibid.*) As a result, when the juvenile court makes jurisdictional findings as to both parents but only one parent appeals, the appeal may be moot. (*Ibid.*) In such cases, the court of appeal nonetheless has discretion to reach the merits of the appeal. (*Id.* at pp. 282-283)

In considering whether to exercise that discretion, we may consider an array of factors, including whether the challenged jurisdictional finding could potentially affect current or future dependency proceedings or otherwise have negative consequences for the appellant. (*In re D.P., supra,* 14 Cal.5th at p. 285.) Reviewing the validity of the juvenile court's jurisdictional findings "may be particularly important" because the child welfare agency and juvenile court may rely on a prior jurisdictional finding in connection with a future dependency petition. (*Ibid.*) Further, jurisdictional findings may affect

9

placement decisions as well as family court proceedings.  (*Ibid*.) Ultimately, we are guided by the goals of the dependency system, which aim to maximize the protection of the child, preserve the family, and ensure the child's safety and physical and emotional well-being.  (*Id*. at p. 286.)

In the circumstances here, we agree with mother that review is appropriate because the validity of the jurisdictional finding could affect the juvenile court's subsequent orders as well as further family court proceedings.  For example, at the jurisdictional hearing, the child's counsel expressed concern about the child remaining in mother's custody, and the court wondered "why isn't this child detained and not in the care of either parent?"  But if the jurisdictional finding against mother were reversed, mother would be a "nonoffending parent" who is entitled to greater safeguards before the child can be removed from her custody in dependency proceedings.  (See, e.g., *In re Isayah C.* (2004) 118 Cal.App.4th 684, 697 ["a nonoffending parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be 'detrimental to the safety, protection, or physical or emotional well-being of the child' "].)  If the case is ultimately returned to family court, as mother has requested, then the juvenile court's jurisdictional findings could prejudice mother in that context.  (See *In re D.P.*, *supra*, 14 Cal.5th at p. 285.)

Accordingly, we turn to the merits of mother's challenge.

### B.

Mother asserts that there is insufficient evidence to support the juvenile court's finding that the child is at "substantial risk of suffering serious emotional damage" under section 300, subdivision (c), as a result of her conduct.  We agree.

As relevant here, section 300, subdivision (c), provides for dependency jurisdiction when the child "is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian." Section 300, subdivision (c), applies when "parental fault" or neglect places the child at substantial risk of suffering serious emotional harm. (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557 (*Alexander K.*); accord *In re Roxanne B.* (2015) 234 Cal.App.4th 916, 921.) To support jurisdiction, the Department must establish the "offending parental conduct," causation, and a "substantial risk of . . . serious emotional damage" as specified in the statute. (See § 300, subd. (c); *Alexander K.*, at p. 557; *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379 (*Brison C.*).) Section 300, subdivision (c), reaches "abusive, neglectful and/or exploitive conduct toward a child which causes . . . the serious symptoms identified in the statute," not "run-of-the-mill flaws in . . . parenting styles." (*Alexander K.*, at p. 559.) The question is whether the circumstances at the time of the jurisdictional hearing posed the statutorily defined risk of harm. (*Id.* at p. 560.)

Here, there is little evidence that mother committed offending conduct. (See *Alexander K.*, *supra*, 14 Cal.App.4th at p. 557.) The petition alleged that the child was at risk due to mother's "excessive efforts to prove allegations that the father . . . sexually abused the child," which led the child to be interviewed by Department workers and other professionals. Neither the petition nor the court suggested that mother did anything wrong in reporting the child's concerning statements to the Department, nor is there any evidence in the record that mother fabricated the child's statements. After mother reported the child's statements in 2024, the Department advised mother to take the child to be examined at the hospital and the Department conducted interviews of the child. When mother reported the child's

11

statements in May 2025, the Department sought to interview the child on two more occasions. In allowing the child to be examined and interviewed, mother was following the Department's advice or acceding to its requests. The Department apparently believed, based on the child's reported statements, that it was necessary and appropriate for the child to be interviewed and undergo a medical examination. Mother's actions in doing what the Department told her to do cannot constitute offending conduct. (See *Alexander K.*, at p. 557.)

At most, mother asked the child a few leading questions and prompted the child to show her how she had been touched, to obtain more information or document disclosures the child had already made. But the juvenile court rejected the petition's allegations that mother had attempted to "coax" the child to disclose abuse. The court found that mother was not "intentionally trying to get [the child] to say things." Consistent with the court's finding, mother testified that she has never been trained in investigating or interviewing children, and she was not trying to lead her daughter to give particular responses.

Even assuming that mother's unskilled efforts to gain more information about what had occurred rise to the level of offending conduct, the record lacks substantial evidence that, at the time of the jurisdictional hearing, the child was at substantial risk of serious emotional damage from that conduct. Crozier, the social worker, testified that, depending on the child, sexual abuse investigations and medical examinations can negatively impact a child. She explained that when a child is "being told they have been abused . . . [¶] . . . [¶] . . . typically there is a negative impact" such as regression, cutting, self harm, or issues with eating and sleeping. But mother took steps to insulate the child, who was four at the time, including by making her reports to the Department outside of the child's presence, having whispered conversations with Department staff in a separate room,

declining the Department's request to bring law enforcement to an interview, and declining a more invasive physical exam at the hospital.  When mother took the child to be examined at the hospital, mother "told her [she was] going to get a checkup"; mother "didn't tell her it had anything to do with anything she had said."  When Department staff came to interview the child, mother "just told [her] that . . . there was a couple people that were going to talk to her" but she "didn't tell her why or what or anything."  There is no evidence in the record that mother ever told the child that she was being abused.

Nor was there any evidence specific to the child that she was beginning to show any signs of negative emotional impact from mother's questioning, as the Department acknowledges.  In her May 2025 investigation, Crozier was "not able to gauge the [emotional] impact" of the sexual abuse investigations on the child but testified that "[p]otentially there could have been impact."  When asked what evidence there was that the child has suffered emotional abuse, the only evidence Crozier pointed to was that the child stuck her tongue out of her mouth and put her hands in her mouth during an interview, but Crozier admitted that she could not "correlate" that behavior to emotional abuse. In a May 2025 interview, "[t]he child indicated she felt safe with her mother and father."  Alvarado reported that the child did not appear to be severely anxious, depressed, or ill.  When asked whether the child displayed any aggressive behavior toward others during the investigation, Alvarado recalled only that the child "playful[ly]" bit her mother. The investigation report concluded that the Department "does not have enough evidence to prove that [emotional abuse] has happened."[4]

---

[4] The Department contends in passing that the child was exhibiting some sexualized behavior as a result of mother's questioning, noting that the child stated to Alvarado that "Dad hit butt" and touched her vagina.  There is no evidence in the

13

The Department was "concern[ed] that *if the parents continue their behaviors/actions* there could be an emotional impact to [the child] in the future." (Italics added.) But by the time of the juvenile court's jurisdictional finding, more than four months had passed since the May 2025 abuse allegations, and there was no evidence that any offending conduct by mother had occurred in the interim or would continue in the future. Indeed, the Department's briefing does not even argue that mother is likely to continue any problematic questioning of the child. Crozier explained to mother that "because of the situation of her videotaping and having the child repeat the incident that it was not appropriate and to let law enforcement interview moving forward." Mother testified that she did not plan on asking the child to repeat any of the concerning statements she had previously made, nor did she plan on bringing up the subject with the child again. If the child were to make any further concerning statements, mother would report them to the Department hotline. In addition, mother had completed two years of parent-child therapy with the child and had arranged to have the child start individual counselling with Humboldt County Children's Behavioral Health.

---

record that the child's touching of her private parts or related statement constituted "sexualized behavior" or that the behavior was harmful. Nor was there substantial evidence that mother caused the child to display the behavior in question. The jurisdiction report stated that the child made the statement, "Dad hit butt," when Alvarado asked her what she wanted to share. Only after Alvarado asked the child "what that looked like" did the child slap her vagina. Alvarado testified that she was not with the child and mother immediately before this interaction, so Alvarado would not have known whether mother did anything to prompt the child. According to mother, she did not say anything to prompt the child to speak to Alvarado.

In the circumstances here, there was insufficient evidence at the time of the juvenile court's jurisdictional ruling that the child was at "substantial risk" of suffering "serious emotional damage" based on mother's questioning. (§ 300, subd. (c); see *Brison C.*, *supra*, 81 Cal.App.4th at p. 1379 ["Standing alone, the past infliction of harm does not establish the substantial risk of future harm. Rather, ' "there must be some reason to believe the acts may continue in the future." ' "].)

The Department primarily relies on the broader conflict between mother and father, citing the "ongoing family law case" and the juvenile court's finding that the parents were in "constant battle with each other it seems." The dependency petition did not allege, however, that ongoing parental conflict placed the child at substantial risk of serious emotional harm; instead the petition alleged more precisely that the child was at risk from mother's "excessive efforts to prove allegations that the father . . . sexually abused the child." The juvenile court rejected the notion that mother was trying to do that or, indeed, that she asked the child about sexual abuse out of "malice" toward father. We thus are uncertain what offending conduct supports the Department's theory, much less offending conduct that caused a risk of emotional damage.

Moreover, it is true that the juvenile court "may amend a dependency petition to conform to the evidence received at the jurisdiction hearing to remedy immaterial variances between the petition and proof." (See *In re Andrew S.* (2016) 2 Cal.App.5th 536, 544 & fn. 4.) But the court may not make a material change to the petition's allegations without affording notice and a chance to respond to the change. (See *ibid.*; *In re I.S.* (2021) 67 Cal.App.5th 918, 927-932.) Here, the change cannot be considered immaterial given that the court limited mother's counsel's ability to question mother about the dynamic and interactions with father. Although mother's counsel sought to

15

examine her about the state of her relationship with father, the Department objected that "[t]his is nothing that is relevant to the allegations in the petition. We are not relitigating the Family Law matter here." The court sustained the objection, rejecting mother's counsel's argument that the court should allow the line of questioning because "the allegations have to do with how the parents get along and whether it rises to the level of needing Child Welfare intervention because of how the parents deal with each other." Although the court did not strike mother's responses to questions that had already been asked, the court instructed mother's counsel to "just move on from how [the parents] get along." In light of the position taken by the Department in the juvenile court and the court's ruling, we reject the Department's reliance on matters not alleged in the petition.

## C.

Having found that the juvenile court's jurisdictional ruling was unsupported as to mother, we must consider the appropriate resolution given that the jurisdictional findings against father remain unaffected by this appeal. Mother requests that we order the court "to dismiss the petition in its entirety if conditions no longer exist warranting juvenile court intervention at the time of remand." Alternatively, mother requests that we order the court to terminate jurisdiction after placing the child in her custody. Where, as here, the juvenile court has jurisdiction over the child based on the conduct of one parent, the court nonetheless has authority to order the nonoffending parent to participate in family maintenance services. (See *In re D.L.* (2018) 22 Cal.App.5th 1142, 1148; § 362, subd. (a).) Accordingly, and mindful that circumstances may have changed since the October 2025 jurisdictional hearing, we will reverse the jurisdictional findings as to mother and remand the case for the juvenile court to issue appropriate orders based on the circumstances existing at the time of remand.

16

## DISPOSITION

The juvenile court's jurisdictional order is reversed in part as to the finding that pertains to mother's conduct. The order is affirmed in all other respects, and the case is remanded for further proceedings consistent with this opinion.

                                        BURNS, J.

WE CONCUR:


JACKSON, P. J.
CHOU, J.

*In re C.W. / Humboldt County Department of Health and Human Services v. K.W. (A175108)*

17